# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STEPHANIE ROBINSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 13 CV 3218 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| ABBOTT LABORATORIES, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION & ORDER

Stephanie Robinson sued her former employer, Abbott Laboratories, alleging that Abbott discriminated against her on the basis of her race (Robinson is African-American) when the company fired her, in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2000e-17. Abbott moves for summary judgment. For the reasons explained below, the motion is denied.

### I. BACKGROUND

From December 2007 to October 2012, Stephanie Robinson worked as a medical safety analyst at Abbott's customer contact center. Robinson's job responsibilities included answering calls from Abbott customers and health care professionals who had questions or concerns regarding Abbott's pharmaceutical products. From 2007 to 2010, Robinson's responsibilities were limited to collecting information from callers about defects in Abbott's products. After 2010, Robinson's job responsibilities expanded to include providing callers with medical information related to certain pharmaceutical products. For example, Robinson was trained on and responsible for providing medical information related to an Abbott product called Synthroid.

Robinson was also responsible for processing patient requests for reimbursements for Abbott products. She twice received training on the reimbursement procedure, including the requirements to validate and document a reimbursement request. Abbott has a five-step process for validating and documenting such a request. First, the analyst determines whether there is an acceptable reason for reimbursement. Second, she verifies that the customer has unused and unexpired medication. Third, she determines whether the customer has made a previous request for the same product. Fourth, she instructs the customer to discard the unused medication. Fifth, and finally, she instructs the customer to provide a pharmacy receipt, indicating the patient's name, the drug name, and the cost. Once the pharmacy receipt is received, the analyst must verify the pharmacy receipt with the pharmacy and document that verification on a "Patient Reimbursements of U.S. Pharmaceutical Products" form, also known as an "F-22 Form." The analyst is then supposed to deliver the F-22 form and the receipt to the refund processor. The refund processor assembles the F-22 forms and submits them to Gregory Whitacre, who is the director of Abbott's medical services contact center.

Whitacre reviews the F-22 forms for completeness and accuracy. If the F-22 forms are complete and accurate, Whitacre signs the forms, and they are then submitted to the finance department for final approval and processing. If, during his review, Whitacre notices that an F-22 form is inaccurate or incomplete, Whitacre returns the form to the appropriate analyst to correct any errors before the form is approved and submitted to the finance department.

**A. The "Syntheroid" Reimbursement Request**

In June 2012, Robinson worked on a patient request for a reimbursement that Abbott received through one of its product websites. Robinson called the patient's telephone number and informed the patient's mother that to process the request, the patient had to submit the

pharmacy information and receipt to Abbott. In working on the patient refund form in connection with this request, Robinson checked off two out of the five pre-printed tasks on the form that she had not yet completed, including contacting the pharmacy, and she signed and dated the reimbursement form. She says that she did this in an effort to "multitask" and "work ahead."

Later in June, Abbott received a packing slip from the patient in support of his reimbursement request. The packing slip did not contain any pharmacy name or contact information and it indicated that the customer was requesting a refund for a product named "Syntheroid," which was different from Abbott's "Synthroid" product. Robinson realized that the product the patient purchased was not an Abbott product. She therefore determined that the patient was not entitled to a refund from Abbott. She intended to strike out the indication on the form that she had called the pharmacy and to cross out the Abbott drug name on the form, but she became busy with another task and set the form down on her desk.

On July 9, 2012, Robinson took a medical leave of absence. The parties dispute whether Robinson "submitted" the F-22 form before she went on medical leave. Abbott contends that she did. Robinson contends that she left the refund form on her desk and never submitted it.

**B. Whitacre's Review and the Subsequent Investigation**

While Robinson was on medical leave, Whitacre reviewed the June 26, 2012, F-22 form that Robinson had signed regarding the request for reimbursement for the "Syntheroid" drug. Whitacre noticed that the form was not for an Abbott drug. He also noticed that the receipt attached to the F-22 form was not a pharmacy receipt, but rather a packing slip, that did not include any pharmacy's name or contact information. Because of this, Whitacre believed that

Robinson may have falsified the F-22 form, and he asked Robinson's supervisor, Michelle Kupfer, to look into the issue.

Kupfer reviewed the form and agreed that it was possible Robinson falsified it. She alerted Anna Wilson, an employee relations specialist, of the potential document falsification. Wilson told Kupfer to speak with Robinson about the form.

On October 9, 2012, Robinson returned to work from her leave of absence. On October 11, 2012, Kupfer discussed the form with Robinson. The parties agree that during the discussion, Robinson admitted that she checked the box indicating "pharmacy receipt verified" even though she had not verified the receipt with the pharmacy. The parties otherwise dispute the contents of the conversation between Kupfer and Robinson. According to Abbott, Robinson told Kupfer that she had not verified the receipt because "at that time, [she] did not care about quality," as she "was going to have surgery in a couple days and just didn't care." (Kupfer Dep. Ex. 9 (Notes), ECF No. 23-8.) Robinson disputes that she said this to Kupfer and contends that Kupfer lied about this statement to build a termination case against Robinson. According to Robinson, when Kupfer asked her about the form, Robinson told her that she recalled it as a refund request form that she did not complete before going on leave. She told Kupfer that she knew the request involved a non-Abbott drug and that there would not be any reimbursement. She asked Kupfer where she got the form, but Kupfer did not answer. According to Robinson, she explained to Kupfer that she realized something was wrong with the form and that she put it aside so she could straighten it out before she went out for surgery.

Kupfer then told Wilson about her conversation with Robinson, relaying Robinson's alleged statements that she "did not care about quality" and expressing her view that Robinson intentionally falsified the F-22 form. Wilson then began an investigation into Robinson's

4

conduct. On October 18, 2012, Wilson interviewed Robinson regarding the F-22 form. Marzia Sistanwala, another employee relations specialist, witnessed the interview conducted by Wilson and memorialized the conversation in her interview notes. Those notes indicate that Robinson admitted that she never called the pharmacy. According to the notes, Robinson also stated that she admitted she was "mentally gone" and "understood her mistake." (Wilson Aff. Ex. C (Sistanwala Notes).)

## C. Abbott Fires Robinson

At some point, Wilson prepared a "termination worksheet" in which she recommended firing Robinson. Robinson states that Wilson had already begun preparing the worksheet on September 27, 2012, during Robinson's leave of absence and before anyone interviewed her about the refund request form. She bases this on the fact that the termination worksheet is dated "9/27/2012." (Wilson Dep. Ex. 4 (Termination Worksheet), ECF No. 32-4.) Wilson contends that the date on the form is erroneous and that she did not begin to draft it until after her October 18, 2012, interview with Robinson.

In the worksheet, Wilson stated that Robinson told her during the interview that she "just wanted that paperwork off [her desk]." (*Id.*) Robinson contends that this is false and that she never said anything to that effect to Wilson. She points out that Sistanwala's notes from the interview do not reflect that Robinson made any statement about wanting paperwork off her desk.

Wilson recommended that Abbott fire Robinson "for falsifying patient reimbursement documents." (*Id.*) Wilson's recommendation was reviewed and approved by Abbott's human relations department. Abbott fired Robinson on October 30, 2012.

**D. Alleged Misconduct by Other Medical Safety Analysts**

Robinson claims that several other non-African-American medical safety analysts were treated more favorably than she even though they committed misconduct that was just as severe as Robinson's. Robinson's claim is based on her counsel's review of handwritten notes of F-22 forms signed by the other analysts. The forms stated as follows:

- A form signed by Jennifer Harbison on March 25, 2011, states that "[t]he patient stated that she had medication left at the time of recall but she already threw it in the trash." The form indicates that Whitacre initially approved the refund on April 1, 2011. On April 7, 2011, Harbison wrote that she called the "pharmacy who stated that the expiration of any regular med is one year from fill date . . . ." On April 11, 2011, Whitacre crossed out his initial approval of the refund and wrote "[r]ejected refund request due to pharmacy response on expiration date." (Pl.'s Ex. F, ECF No. 32-6.)

- A form signed by Harbison on September 9, 2011, states that "[t]he patient did not have any medication left." On September 12, 2011, Harbison wrote, "OK to refund most recent Rx fill only." Whitacre crossed out the September 12 entry and wrote "incorrect response to refund request." He wrote, "Request denied as no medication was remaining . . . ." On September 22, 2011, Whitacre wrote, "Call from consumer indicating that she does have product remaining. Instructed patient to destroy product. OK to refund most recent refill." (Pl.'s Ex. G, ECF No. 32-7.)

- A form signed by Karen Schreier on September 24, 2012, includes check marks next to each of the five boxes corresponding to the five steps a medical safety analyst must follow under Abbott's reimbursement procedure. Supervisor Sharon Moore wrote on the form, "No MIRS [database] entry for the caller." (Pl.'s Ex. J, ECF No. 32-10.)

- A form signed by Julie Dobryman on October 6, 2011, indicates that on November 1, 2011, Harbison, who was a "refund specialist," called the pharmacy to "verify [the] Rx number was Androgel." Whitacre approved the refund on November 7, 2011. The form indicates that Dobryman performed a "duplicate check" on December 5, 2011. (Pl.'s Ex. K, ECF No. 32-11.)

- A form signed by Dobryman on November 4, 2010, includes a post-it note from Whitacre that states, "Julie: Please verify that Meridia was left over at time of withdraw." On February 17, 2011, Whitacre wrote, "Request denied as product was expired at the time of the Meridia withdraw . . . ." (Pl.'s Ex. L, ECF No. 32-12.)

- A form signed by Julie Sheriff on December 22, 2010, includes a notation by Whitacre on December 27, 2010 that he called the pharmacy to verify that the receipt was legitimate. (Pl.'s Ex. N, ECF No. 32-13.)

- A form signed by Irfan Khan on October 27, 2011, includes a notation by Whitacre stating, "This stack needs . . . comments that [databases] were searched for some name/product reimbursed . . . [and] documentation that patient was told they cannot seek additional reimbursement from pharmacy/Medicare etc." On December 6, 2011, Khan added the comments requested by Whitacre. (Pl.'s Ex. O, ECF No. 32-13.)

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## III. ANALYSIS

Abbott argues that Robinson's race discrimination claim fails as a matter of law because she cannot establish a *prima facie* claim of discrimination. Under the *McDonnell Douglas* indirect method, a plaintiff may establish a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class; (2) her performance met her employer's legitimate expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably." *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 554 (7th Cir. 2011) (internal quotation

7

marks omitted); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Eaton*, 657 F.3d at 554 (internal quotation marks omitted).  Once the employer articulates a non-discriminatory reason for its action, the burden shifts back to the plaintiff to present evidence showing that the employer's purported reason was pretextual.  *Id.*; *see also Nelson v. Lake Cnty.*, No. 12 C 6887, -- F. Supp. 3d --, 2014 WL 4652124, at *2 (N.D. Ill. Sept. 18, 2014).

The first and third elements of the *prima facie* case are not at issue; Robinson is African-American, and she was fired.  Abbott argues, however, that Robinson cannot show that (1) her performance met her employer's legitimate expectations and (2) Abbott treated similarly situated employees outside of her protected class more favorably.  Abbot further argues that even if Robinson could establish a *prima facie* case, she cannot show that the employer's purported reasons for firing her were pretextual.

**A. Robinson's Performance**

Abbott argues that Robinson cannot show that she met her employer's legitimate expectations.  In cases such as this one, however, where the employee "admits that she broke the rules but claims that [her employer] disciplined her more harshly than non-[African-American] rule-breakers," courts have held that it "makes little sense . . . to discuss whether she was meeting her employer's reasonable expectations."  *Flores v. Preferred Technical Grp.*, 182 F.3d 512, 515 (7th Cir. 1999).  The issue is whether Abbott was singled out for discipline because of her race.  Thus, Robinson "does not have to show that she was meeting her employer's legitimate expectations in order to establish a *prima facie* case of discriminatory discharge."  *Id.*; *see also Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 (7th Cir.

2007) ("Where . . . an employee claims that she performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same—whether the employer is lying.") (internal quotation marks omitted). The court therefore proceeds to the fourth prong of Robinson's *prima facie* case.

**B. Similarly Situated Employees**

"The similarly-situated inquiry is flexible, common-sense and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)). "There must be sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.* (internal quotation marks omitted). "In other words, the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision." *Id.*

"Whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Id.* at 846 (quoting *Srail v. Vill. of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)). "In the usual case a plaintiff must show at least that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Robinson has identified five non-African-American medical safety analysts who she claims held the same job duties, were subject to the same standards, and engaged in similar conduct as hers. Although the court agrees with Abbott that it is unclear from these analysts' F-22 forms whether they actually violated any of Abbott's policies, the forms do make clear that analysts sometimes made innocent mistakes that Whitacre then corrected. Additionally, analysts Harbison, Randals, and Schreier all testified that they received forms back from Whitacre stating that they were inaccurate or incomplete, but Abbott did not discipline these employees. In any event, there is no real dispute that other analysts submitted inaccurate or incomplete reports; the question is whether Robinson's conduct was sufficiently similar to these kinds of innocent mistakes made by other analysts.

Under Abbott's version of events, the answer to that question is clearly no. According to Abbott, Robinson intentionally checked the box indicating that she had contacted the pharmacy because she "did not care about quality" and "wanted that paperwork off her desk." She then submitted the form to be processed knowing that its contents were false. Even Robinson agrees that, if she had done this, Abbott would have had legitimate reason to fire her.

But Robinson's version of what transpired is very different, and at the summary judgment stage, the court must construe all facts and make all reasonable inferences in her favor. According to Robinson, she never submitted the form to her supervisors—she left it on her desk when she left for medical leave. There is no evidence in the record suggesting that employees submitted reimbursement request forms by leaving the forms on their desks, and, in fact, Harbison testified that all analysts submitted their forms by placing them in a bin labeled "refunds." According to Robinson, when she learned that the contents of the form were false, she intended to correct the form but got distracted by another project. It may have been unwise

for Robinson to check a box before the task was completed and then to not correct the form immediately. But when she learned it was false, if that that was all Robinson did, a reasonable fact-finder could conclude that such misconduct is sufficiently similar to the conduct of non-African-American analysts who submitted forms with inaccurate and incomplete information. Thus, defendants are not entitled to judgment as a matter of law based on the fourth prong of the *McDonnell Douglas* indirect method. The final issue is whether Robinson can show pretext.

## C. Pretext

Abbott has offered a legitimate, nondiscriminatory reason for firing Robinson—it claims that Robinson "knowingly falsified the F-22 form in question to avoid having to perform work." (ECF No. 22, at 8.) To show this reason is pretextual, Robinson "must present evidence suggesting that the employer is dissembling." *Coleman*, 667 F.3d at 852 (internal quotation marks omitted). To meet this burden, Robinson must "'identify such weaknesses, implausibilities, inconsistencies, or contradictions'" in Abbott's asserted reason "'that a reasonable person could find it unworthy of credence.'" *Id.* (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). If Abbott terminated Robinson because it "honestly believed" she knowingly falsified patient reimbursement documents—even if this reason was "foolish, trivial, or baseless"—Robinson loses. *Coleman*, 667 F.3d at 853 (internal quotation marks omitted). "On the other hand, 'if the stated reason, even if actually present to the mind of the employer, wasn't what induced him to take the challenged employment action, it was pretext.'" *Id.* (quoting *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006)).

Here, although Robinson has not come forward with any direct evidence that Abbott's true reason for firing her was based on a discriminatory intent, she has identified sufficient circumstantial evidence to create a genuine issue of fact as to whether Abbott's asserted reason

11

for terminating her was pretextual. First, according to Robinson's sworn testimony, her supervisors lied during the investigation about what Robinson told them. Robinson testified that Kupfer's statement to Wilson that she "didn't care about quality" was untrue. (Robinson Dep. 141:19-23, ECF No. 32-1.) She also stated under oath that Wilson lied when she stated in her report that Robinson said she "just wanted that paperwork off her desk." (Robinson Decl. ¶ 5, ECF No. 32-2.) Construing the facts in Robinson's favor, a fact-finder could reasonably conclude that Kupfer and Wilson made up these lies because they knew that their stated reason for firing her—that she knowingly falsified the F-22 form to avoid having to perform work—was false, that they knew Robinson had made an innocent mistake, and that they needed to exaggerate Robinson's statements to justify firing her.

In addition to Kupfer's and Wilson's allegedly false statements, Robinson has come forward with additional circumstantial evidence that the investigation into her misconduct was itself pretextual in nature. Robinson maintains that she never submitted the form, and Abbott has offered no plausible explanation for how the form ended up in the hands of Robinson's supervisors. Wilson's termination worksheet is dated September 27, 2012, during Robinson's leave of absence and before anyone interviewed her about the form. And, construing the facts in Robinson's favor, Kupfer reported Robinson to Wilson even after Robinson explained what had happened and offered to fix the mistake. A fact-finder crediting Robinson's testimony could view these facts and reasonably conclude that Abbott's proffered reason for firing Robinson was pretextual.

## IV. CONCLUSION

For the foregoing reasons, Abbott's motion for summary judgment is denied. A status hearing is set for October 16, 2014, at 9:30 a.m.

12

ENTER:

      /s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 29, 2014